**STATE**

v.

**Sonny FORTES.**

**No. 2006–83–C.A.**

Supreme Court of Rhode Island.

May 22, 2007.

---

Virginia M. McGinn, Esq., for Plaintiff.

Janice M. Weisfeld, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The defendant, Sonny Fortes, appeals to this Court from a judgment of conviction after a jury found him guilty of two counts of first-degree sexual assault, in violation of G.L.1956 § 11–37–2, and of one count of burglary, in violation of G.L.1956 § 11–8–1. The defendant was sentenced to concurrent terms of thirty years, twenty years to serve and ten years suspended with probation with respect to the sexual assault charges; in addition, he was sentenced to a term of thirty years, five years to serve and twenty-five years suspended with probation with respect to the burglary charge.

The defendant's sole argument on appeal is that the trial justice erred in letting stand certain comments made by the prosecutor in her closing argument to the jury.

According to defendant, those comments (1) were neither supported by the evidence nor by the reasonable inferences that could be drawn therefrom and (2) were unfairly prejudicial to defendant.

For the reasons set forth in this opinion, we affirm the judgment of conviction.

## Facts and Travel

The defendant and the complaining witness, Laura Fortes, had a tumultuous relationship that lasted for thirteen years and produced four children. The couple married in November of 1999. While they were together, defendant lived with Mrs. Fortes and their children in a townhouse on Providence Avenue in the Bullocks Point Complex in Riverside, Rhode Island.

Mrs. Fortes testified that in May of 2002 she asked defendant to move out because he had become verbally and physically abusive to her. Mrs. Fortes specifically testified that she had been hospitalized after one abusive incident, in the course of which defendant pulled out a clump of her hair and fractured her nose and an eardrum. In addition, according to Mrs. Fortes, defendant made threatening statements to the effect that "he could kill [her] and get away with it because he is mentally ill."

Mrs. Fortes filed for divorce in June of 2002; she testified that defendant's behavior then became worse because he was furious with her for filing for divorce. At some point during the spring of 2002, Mrs. Fortes had defendant's name removed from the lease on their townhouse. Then, in September of 2002, defendant and Mrs. Fortes attempted to reconcile; from that time, defendant stayed with his family at the townhouse on and off through December of 2002. According to Mrs. Fortes, defendant generally stayed for periods of two to three weeks, at which point they would begin to fight and defendant would leave again.

In January of 2003, Mrs. Fortes became ill, and defendant offered to move back into the townhouse to care for their children. She testified that she accepted defendant's offer but made it clear to him that, once her health improved, he would have to move out again. After defendant left at the end of January of 2003, Mrs. Fortes had new locks and bolts put on the front and back doors to her home and she had the windows nailed shut. Mrs. Fortes testified that she felt that those measures were needed. because defendant had broken into the townhouse on several previous occasions in the Summer and the Fall of 2002, a time when they were not living together. Mrs. Fortes acknowledged that she had never filed a police report with respect to those alleged breaking and entering incidents.

According to Mrs. Fortes, despite the above-described security precautions, defendant managed to enter the townhouse on February 6, 2003. Mrs. Fortes testified that she had gone to bed at approximately 10 p.m., at which time her two older children were sleeping in their bedroom, one of her daughters was sleeping beside Mrs. Fortes in her bed, and the youngest child was sleeping in a youth bed in Mrs. Fortes's bedroom. She further testified that she was awakened at some point by defendant, who smelled of alcohol and who was "tugging at [her] sheets." Mrs. Fortes testified that defendant then had sexual intercourse with her. She stated that she "just laid there" because he was angry with her and she did not want to anger him further. Mrs. Fortes further testified that, after defendant had intercourse with her, he pulled her hair and swore at her; he told her that he could kill her and that nothing, including the police or nails on the windows, could stop him.

According to Mrs. Fortes, defendant became loud enough to awaken the children at some point after 3 a.m.

Mrs. Fortes testified that she did not know how defendant gained entry into the townhouse on the night when the above-described incident occurred, but she stated that she had not given him permission to be there. After defendant left, Mrs. Fortes put her son back to bed, returned to her own bed with the daughter who had been sharing that bed with her, and lay there crying. According to Mrs. Fortes, the next morning she went to an agency called the Women's Resource Center, where she informed a counselor as to what had happened to her. Mrs. Fortes testified that, after the counselor encouraged her to report the incident to the police, she did file a complaint against defendant. Mrs. Fortes further testified, however, that she did not want defendant to be arrested because she "still loved him, and [she] didn't want him to get into trouble." Instead, she wanted the police simply to talk to defendant and tell him to stay away from her.

On or around February 26, 2003, Mrs. Fortes's son fell down some stairs, and she brought him to the hospital. Mrs. Fortes's daughter telephoned defendant to let him know that his son had fallen, and at some point thereafter defendant arrived at the hospital. According to the testimony of Mrs. Fortes, when defendant arrived at the hospital, he had been drinking and appeared furious, threatening Mrs. Fortes as well as the doctors who were treating their son. Mrs. Fortes testified that defendant then demanded that she give him her car keys and, when she relented out of fear, he took her car and left the hospital. Mrs. Fortes took a taxi from the hospital to her parents' house, which was located around the corner from her own home. While there, Mrs. Fortes telephoned the police, and a police officer accompanied her to her townhouse, as did a maintenance man. The police officer entered the townhouse first and told defendant, who was inside the townhouse, that he had to leave. After defendant left, Mrs. Fortes proceeded to go to the Family Court in order to obtain a restraining order against him.[1]

Mrs. Fortes testified that, after she returned to the townhouse on February 26, she telephoned the police once again because she noticed that someone had tampered with her windows. Mrs. Fortes specifically noted that there were slits on the bottom corners of the screens and that there were pins in the windows.

In the early morning hours of March 2, 2003, Mrs. Fortes was again awakened to find defendant attempting to pull the sheets off her. She testified that defendant then inserted a vibrator into her vagina. Mrs. Fortes stated that she told defendant to stop and that she tried to move to avoid him while trying not to awaken her daughter, who was again sleeping beside her in her bed. According to Mrs. Fortes, defendant then engaged in intercourse with her while she cried and asked him to stop. Mrs. Fortes testified that defendant asked her whether she had obtained a restraining order against him; she further testified that, when she responded that she had, he threatened her saying that she was "going to get it" if he went to jail.

Mrs. Fortes testified that defendant eventually dressed himself and told her to accompany him downstairs, which she did. According to Mrs. Fortes, shortly after she and defendant went downstairs, her

---

1. The record reveals that the restraining order that Mrs. Fortes sought on February 26, 2003 was at least the seventh such order that she had obtained against defendant.

youngest daughter (the one who had been sharing her bed) woke up and called for her. Mrs. Fortes then told defendant that he had to leave, and she went upstairs to tend to her child. It was Mrs. Fortes's testimony that, after she went back upstairs, she once again lay in the bed with her daughter and cried. She testified that she called a domestic violence hotline shortly thereafter and that she then called the police, this time agreeing to press charges against defendant. Mrs. Fortes testified that she did not know how defendant had entered her home; she stated that, before she went to bed on March 1, 2003, she and a neighbor of hers had checked her windows to make sure that they were locked.

On July 3, 2003, defendant was charged by indictment with three counts of first-degree sexual assault and two counts of burglary. One of the burglary counts was dismissed prior to trial pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure. A jury trial commenced on June 1, 2004.

Several East Providence police officers testified at the trial. Officer James Toler testified that on February 7, 2003 he was sent to the home of Mrs. Fortes to investigate an alleged sexual assault. According to Officer Toler, Mrs. Fortes told him that defendant "had entered the house in an unknown manner" and had engaged in sexual intercourse with her without her consent. Officer Toler further testified that Mrs. Fortes at first expressed reluctance to press charges against defendant because she was afraid of him and of his family. Officer Toler testified that he checked the perimeter of the house for signs of forced entry, but he saw none.

Detective William Smith testified that he interviewed Mrs. Fortes on February 8, 2003 regarding the same alleged sexual assault that Officer Toler had investigated. Detective Smith testified that Mrs. Fortes told him during that interview that she had not consented to the sexual intercourse but that "[s]he just said she laid [*sic*] there and let him do it." According to Detective Smith, Mrs. Fortes explained that she did not resist defendant because he had done the same thing to her in the past and would sometimes become violent. Mrs. Fortes told Detective Smith that "[s]he found it easier to just let him do it and let him leave and that way they wouldn't disturb the kids." Detective Smith testified that Mrs. Fortes did not want to press a complaint because she was in fear of retaliation by defendant and his family.[2]

Officer Darren Ellinwood testified that on February 26, 2003 he responded to a report of suspicious activity at Mrs. Fortes's Providence Avenue address. Officer Ellinwood further testified that, when he spoke to Mrs. Fortes on that occasion, she indicated that she believed that defendant had tampered with her windows. After conducting a check of all of the windows in the townhouse, Officer Ellinwood noticed that all of the screens had been cut at the "track latch" and that two of the windows had been propped open with pen caps. It was Officer Ellinwood's belief that the windows had been damaged as a result of actions taken from the interior of the house. His belief was based on the fact that there were no footprints in the snow outside of the townhouse. According to Officer Ellinwood, Mrs. Fortes informed him that defendant had had access to her townhouse earlier that morning because he had taken her keys from her when they

2. Detective Smith testified that, after the alleged sexual assault on March 2, 2003, Mrs. Fortes indicated that she had decided to press charges in connection with the February 6, 2003 incident as well.

were together at the hospital with their injured son. Mrs. Fortes also told Officer Ellinwood that defendant had actually been in the townhouse that morning and that he had been removed by the police.

Officer Charles Collins III testified that he was dispatched to Mrs. Fortes's home at approximately 6:30 a.m. on March 2, 2003 to investigate a domestic home invasion. Officer Collins testified that, upon arriving at the scene, he learned that there was a temporary restraining order in place against defendant. According to Officer Collins, when he first entered the townhouse, Mrs. Fortes was sitting at the kitchen table crying and she appeared to be very upset. Officer Collins also testified that he noticed that a container of chicken had been left out on the stove.

After speaking with Mrs. Fortes, Officer Collins canvassed the perimeter of the townhouse looking for evidence that might be at the scene. He testified that he noticed two sets of footprints in the light snow on the ground in the parking lot. Officer Collins testified that the footprints appeared to have been made by the same adult male boot and that they led from the parking area to the back door and window of Mrs. Fortes's townhouse. Officer Collins added that he observed tire tracks near the footprints and also a chicken bone. Officer Collins testified that the chicken bone attracted his attention because he had noticed some leftover chicken inside Mrs. Fortes's townhouse, which "indicated to [him] that someone had removed that chicken bone, the chicken, from inside the apartment and consumed it prior to leaving."

During her closing argument to the jury, in the course of addressing the sexual assaults that had allegedly occurred on March 2, 2003, the prosecutor stated:

"Within minutes [one of the children] is awake. She is up. She does wake up. She waited until her dad and her mom were out of the room so it was safe. She does get up."

Defense counsel objected to that comment. The trial justice, without actually ruling on the objection, responded: "Let's stick to the argument in evidence before us."

Defense counsel also objected to a second comment made by the prosecutor during a later portion of her closing argument when she made reference to the chicken bone that the police found in the parking lot and stated:

"[B]efore [defendant] left, what did he [do]? * * * he * * * grabbed a piece of chicken after he rapes his wife, walks outside, discards the chicken, gets in the car and takes off. That is exactly what happened."

This time the trial justice overruled defendant's objection and stated: "This is argument."

It is undisputed that defense counsel neither requested a cautionary instruction nor moved to pass the case[3] with respect to either of the objected-to statements made by the prosecutor.

At the conclusion of the trial, defendant was found guilty of two counts of first-degree sexual assault and one count of burglary. The jury was unable to agree on a verdict on the remaining count of first-degree sexual assault, and the state subsequently dismissed that charge. The defendant filed a motion for a new trial, which was heard and denied on June 14, 2004.

On August 11, 2004, defendant was sentenced to concurrent terms of thirty years, with twenty years to serve and ten years

---

**3.** In Rhode Island, the terms "motion to pass the case" and "motion for a mistrial" are considered to be synonymous. *State v. Disla,* 874 A.2d 190, 198 (R.I.2005).

suspended with probation, with respect to the sexual assault counts. In addition, defendant was sentenced to a term of thirty years, with five years to serve and five years suspended with probation, with respect to the burglary count. A notice of appeal was filed on August 24, 2004.

## Analysis

On appeal, defendant contends that the trial justice erred in permitting certain comments made by the prosecutor in her closing argument to stand. Those comments, according to defendant, were neither supported by the evidence nor justifiable as reasonable inferences that could have been drawn from the evidence. It is defendant's contention that the trial justice's failure to caution the jury to disregard the comments resulted in prejudice to him, and he argues that that alleged prejudice requires the reversal of his convictions.

The state contends that defendant's objections to the above-quoted comments made by the prosecutor during closing argument were not properly preserved because his counsel neither requested a cautionary instruction nor moved to pass the case after the remarks at issue were made. The state further argues that, even if defendant's objections were properly preserved, the prosecutor's comments reflected reasonable inferences that were properly drawn from the evidence adduced at trial.

As this Court has often stated, in order to preserve for appellate review the issue of prejudicial impropriety in a closing argument, a defendant must not only make an objection at the time when the allegedly improper comment is made, but he or she must also make a request for a cautionary instruction or move for a mistrial. *See, e.g., State v. Remy,* 910 A.2d 793, 800 (R.I.2006); *State v. Horton,* 871 A.2d 959, 964 (R.I.2005); *State v. Portes,* 840 A.2d 1131, 1141 (R.I.2004).

It is undisputed that, in the instant case, after objecting to the allegedly prejudicial remarks made by the prosecutor, defense counsel neither requested a cautionary instruction nor moved to pass the case. The defendant contends, however, that his objections were nonetheless properly preserved for our review. In support of that contention, defendant cites several opinions in which we have recognized an exception to the so-called "raise or waive" rule, where we have determined that a request for cautionary instructions would have been futile in view of the fact that a trial justice had overruled defense counsel's objection.[4] *See State v. Simpson,* 658 A.2d 522, 528 (R.I.1995); *see also State v. Mead,* 544 A.2d 1146, 1150 (R.I.1988) ("Here the trial justice on two occasions summarily overruled defendant's objections. Consequently there would have been little point in requesting a cautionary instruction."); *State v. Lemon,* 478 A.2d 175, 181 (R.I. 1984) ("Absent a timely request for cautionary instructions, this court would grant relief * * * only if it was determined that such request * * * would have been futile * * *.").

In evaluating defendant's contention that it would have been futile to re-

---

4. This Court has also recognized an exception to the general rule requiring a defendant to request a cautionary instruction or move for a mistrial in situations where a defendant's constitutional rights are implicated and the defendant can satisfy the following three-part test: (1) the error complained of must consist of more than harmless error; (2) the record must be sufficient to permit a determination of the issue; and (3) counsel's failure to raise the issue at trial must be attributed to a novel rule of law that counsel could not reasonably have known at the time of the trial. *State v. Remy,* 910 A.2d 793, 800 (R.I.2006). The defendant does not contend that that exception is implicated in the instant case.

quest a cautionary instruction or move for a mistrial, we first note that defendant concedes that the trial justice did not actually overrule his objection to the *first* allegedly prejudicial comment (viz., the prosecutor's reference to defendant's daughter waiting until "it was safe" before coming out of her room). Rather, the trial justice admonished the prosecutor to "stick to the argument in evidence before us." Because the trial justice did not overrule defendant's objection, it cannot be said that it would have been futile to request cautionary instructions or to move for a mistrial with respect to that comment. *See Horton*, 871 A.2d at 965. Consequently, defendant's objection to the prosecutor's first allegedly prejudicial statement was not properly preserved for our review.

The trial justice did overrule defense counsel's objection to the *second* objected-to statement by the prosecutor (the one concerning the chicken bone found in the parking lot). Specifically, after defense counsel objected to the statement, the trial justice stated: "Overruled. This is argument." However, it will be recalled that at that point defense counsel neither requested a cautionary instruction nor moved for a mistrial.

■■■ With respect to this second objected-to comment, we shall simply assume without deciding that defendant's objection was properly preserved for appellate review.[5] And, after carefully reviewing the record, it is our opinion that the prosecutor's comment represented a reasonable inference that could properly be drawn from the evidence in the record. "It is well established that '[a] prosecutor is given considerable latitude in closing argument, as long as the statements pertain only to the evidence presented and represent reasonable inferences from the record.'" *Horton*, 871 A.2d at 965 (quoting *State v. Boillard*, 789 A.2d 881, 885 (R.I. 2002)).

In the instant case, the second objected-to comment consisted of the prosecutor stating in the course of her closing argument that defendant "grabbed a piece of chicken after he rapes his wife, walks outside, discards the chicken, gets in the car and takes off." In assessing the appropriateness of that comment, it is important to bear in mind that, during the trial, Officer Collins, who had responded to the scene of the alleged sexual assault on March 2, 2003, testified that the chicken bone that he discovered in the parking lot of Mrs. Fortes's townhouse attracted his attention because he had previously noticed some leftover chicken inside the townhouse. Officer Collins further testified that it was his belief "that someone had removed that chicken bone, the chicken, from inside the apartment and consumed it prior to leaving." Officer Collins also testified that footprints that appeared to have been made by an adult male boot were found near the chicken bone.[6]

---

5. The defendant is correct that this Court has on some occasions indicated that it would be "futile" for defense counsel to request a cautionary instruction immediately after his or her objection to a remark by the prosecutor has been overruled. However, the more exigent criteria that this Court has applied in several relatively recent cases with respect to when the futility exception may properly be invoked should indicate to the criminal trial bar that there is great risk in relying on the futility exception in order to properly preserve an objection to a prosecutorial remark in closing argument. *See, e.g., Remy*, 910 A.2d at 800; *State v. Horton*, 871 A.2d 959, 965 (R.I.2005).

6. It should be noted that, in the course of testifying about defendant's alleged sexual assault upon her, Mrs. Fortes testified that defendant had been wearing boots when he was in her townhouse that morning.

It is our view that the prosecutor's suggestion during closing argument that defendant had been the one to consume the chicken was a reasonable inference in light of Officer Collins's testimony and that of Mrs. Fortes.

It is also noteworthy that, in his preliminary instructions, the trial justice instructed the jury as to what constituted evidence in the case. Specifically, he stated:

"What happens next is that each attorney will be allowed to argue to you. Now, an argument is an attempt to persuade you of something and each attorney gets an opportunity to address you to try to highlight aspects of this case that they may think are important for you to focus on. *What the attorneys say to you in argument is not evidence,* but they're allowed to highlight evidence to you, but you must rely on your recollection of the evidence and the testimony not theirs or mine, because you are the judges of the facts." (Emphasis added.)

During his final charge to the jury, the trial justice again reminded the jurors that the closing arguments of counsel were not evidence. He stated:

"It has been the duty of the attorneys in this case to sum up the testimony as honestly as they view it and to remember it and to base their arguments on their memory. If you find that any argument by either counsel is based upon a faulty memory of testimony, or is based upon testimony which you, the jury, do not accept as true, you should rely on your own memory and you may discount the argument because of this. *"It is important to remember that the arguments of counsel [are] not evidence to be considered in deciding the issues in this case.* You, the members of the jury, are the sole judges of the facts." (Emphasis added.)

After examining the prosecutor's argument in its entirety and in light of the clear instructions given by the trial justice, *see State v. Mancini,* 108 R.I. 261, 274, 274 A.2d 742, 749 (1971), it is our opinion that the prosecutor's comment was reasonable and was not unfairly prejudicial to the defendant.

## Conclusion

For the foregoing reasons, we affirm the judgment of conviction. The record may be remanded to the Superior Court.