II
Discussion
A
The Prosecutor's Closing Argument
The defendant argues that the trial justice erred by failing to declare a mistrial after the prosecutor made inappropriate, pungent, vulgar, and inaccurate remarks during the course of his closing argument. In this regard, defendant argues that the prosecutor strayed beyond the bounds of proper conduct during his closing arguments in three separate instances: (1) the prosecutor referred to the rules of hearsay as the reason he "couldn't say things[,]" (2)
*1237 the prosecutor misstated the medical examiner's testimony, and (3) the prosecutor claimed multiple times that defense counsel had referred to Mrs. Mouchon as a "slut" and a "whore[,]" and he expressed his personal outrage at those characterizations during his closing statement.
"It is well settled that a decision to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." State v. Dubois , 36 A.3d 191, 197 (R.I. 2012) (quoting State v. Barkmeyer , 949 A.2d 984, 1007 (R.I. 2008) ). "We often have stated that 'the trial justice has a front row seat during the trial so that he can best evaluate the effects of any prejudice on the jury.' " Id. (quoting Barkmeyer , 949 A.2d at 1007 ). "The ruling of the trial justice * * * is accorded great weight and will not be disturbed on appeal unless clearly wrong." Id. (quoting Barkmeyer , 949 A.2d at 1007 ). "[T]here is no formula in law which precisely delineates the proper bounds of a prosecutor's argument * * *." State v. Tucker , 111 A.3d 376, 388 (R.I. 2015) (quoting State v. Boillard , 789 A.2d 881, 885 (R.I. 2002) ). Prosecutors enjoy "considerable latitude in closing argument, as long as the statements pertain only to the evidence presented and represent reasonable inferences from the record." Barkmeyer , 949 A.2d at 1007 (quoting Boillard , 789 A.2d at 885 ). "If the trial justice provides a cautionary instruction to the jury, this Court must assume that the jury has complied with it unless some indication exists that the jury was unable to comply with the instruction." Barkmeyer , 949 A.2d at 1007 ; see State v. Powers , 566 A.2d 1298, 1304 (R.I. 1989).
1
Reference to Hearsay Rules in Closing Argument
Roscoe first takes issue with the prosecutor's statement during the state's closing argument that:
"[Ms. Lupino] also retested the blood in the kit to make sure that the blood in the kit matched the non-spermatazoa [sic ] D.N.A. and then she matched the sperm D.N.A. with the swab that she took of his cheek. Because of the hearsay rules, we couldn't say things but I hope everybody was following with how it was working . I know it got to be a little technical because we were talking about the blood tube in the kit matched the non-spermatazoa [sic ] portion and then we talked about the spermatazoa [sic ] portion in the kit matched the buccal swab that they took from him. Because of the rules, that's just the way it is. In voir dire you said you would apply the rules so that's what we did ." (Emphasis added.)
Roscoe argues that those references to the rules of hearsay left the jurors with the impression that inculpatory evidence existed that was known to the state but was kept from them.
To support his argument, Roscoe cites Commonwealth v. Bolden , 227 Pa.Super. 458, 323 A.2d 797 (1974), in which the Superior Court of Pennsylvania awarded the defendant a new trial after the prosecutor remarked during his closing argument that "there are certain things that I cannot tell you referring to this case." Bolden , 323 A.2d at 798. The court held that "the implication is clear that there existed other incriminating or sinister facts which either were inadmissible or could not be produced. The reference could only lead to wild speculation by the jury in their determination of guilt." Id. at 799.
While we agree that, at first blush, the comments by the prosecutor in the present case may resemble those made in Bolden , the prosecutor's remarks here are distinguishable. As the trial justice ruled, when read in context, it is clear that the prosecutor was merely attempting, albeit ineloquently, *1238 to explain the complex and potentially confusing process by which sperm was matched with DNA taken from buccal swabs and other samples. To us, that is quite different from the direct appeal to "wild speculation" that was found to be the case in Bolden . Here, the trial justice discerned no error in the prosecutor's remarks, stating that, while "the [c]ourt's ears went up" at the mention of hearsay, "what [the prosecutor] was trying to do is explain to the jury what the different swabs were and the different testing process that [the jury] heard or didn't hear certain things." The trial justice was in the best position to evaluate any prejudice that the prosecutor's remarks might have engendered, sitting, as he was, in a "front row seat" during the trial. See Dubois , 36 A.3d at 197. He determined that there was no prejudice to defendant, and, as noted above, "[t]he ruling of the trial justice * * * is accorded great weight and will not be disturbed on appeal unless clearly wrong." Id. We can see no error in his ruling about the prosecutor's remarks regarding the rules of hearsay.
2
Inferences Drawn from the Expert Testimony
The defendant also argues that the trial justice erred when he allowed the prosecutor to mislead the jury by misstating the testimony of the medical examiner. We do not agree.
During the trial, the prosecutor posed this hypothetical to the medical examiner on redirect examination: "a person who has a serious heart condition, who is sexually assaulted and assaulted, what impact would you believe that the assault and the sexual assault would have on that person who has that type of heart condition?" The medical examiner's response to this question was, "I believe it would cause an extreme risk to life. I think the individual, the decedent, would have suffered a cardiac arrest as a result of the stress, the panic, and the pain."[4]
There can be no argument that posing a hypothetical question to an expert witness is appropriate. See State v. Feliciano , 901 A.2d 631, 643 (R.I. 2006). Roscoe assigns error, however, to the manner in which the prosecutor characterized the answer to that question in his closing argument to the jury. The prosecutor told the jury:
"The next question for you is if you find there was a sexual assault, the next question did she die as a result of the sexual assault. And I am going to direct your attention back to Dr. Garrity, the expert in this case, 'The pain, the panic, the anxiety of the sexual assault pushed this woman over the edge.' "
Roscoe argues before this Court, as he did below, that with those remarks the prosecutor purported to directly quote Dr. Garrity, but in fact he blatantly misrepresented the medical examiner's testimony.
After reviewing the trial transcripts, we agree with the trial justice that the prosecutor was not engaged in an effort to directly quote Dr. Garrity. Rather, the prosecutor called attention to Dr. Garrity's testimony and attempted to draw what seems to us to be a fair inference that could be gleaned from that testimony. In State v. Fortes , 922 A.2d 143 (R.I. 2007), a police officer who responded to the scene of a sexual assault discovered a chicken bone outside the victim's home. Fortes , 922 A.2d at 148. The officer testified during trial that it was his belief that someone *1239 had removed some leftover chicken from the victim's home and consumed it prior to leaving. Id. at 150. During closing argument, the prosecutor told the jury, "[B]efore [the defendant] left, what did he [do]? * * * he * * * grabbed a piece of chicken after he rapes his wife, walks outside, discards the chicken, gets in the car and takes off. That is exactly what happened." Id. at 148. We held that the prosecutor was permitted to suggest that the defendant had been the person who consumed the chicken because such a suggestion was a reasonable inference from the testimony that had been offered by the officer and the complaining witness. Id. at 151.
In our opinion, it was permissible here for the prosecutor to suggest a reasonable inference that could be gleaned from the trial testimony. Doctor Garrity testified that, in his opinion, a person with a serious heart condition who was assaulted "would have suffered a cardiac arrest as a result of the stress, the panic, and the pain." It is well settled that prosecutors enjoy "considerable latitude in closing argument, as long as the statements pertain only to the evidence presented and represent reasonable inferences from the record." Barkmeyer , 949 A.2d at 1007 (quoting Boillard , 789 A.2d at 885 ). As the trial justice noted, the prosecutor's remarks were not "so outside of what the evidence was." What is more, the trial justice reminded the jury that closing arguments are not evidence. He cautioned the jury that:
"[W]hat was said by the attorneys in their closing arguments is not evidence and should not be considered in evidence. For example, if something was said during closing argument and your recollection or notes of what the testimony was during the trial are different, you are to rely on your memories and your notes and not what was said. * * * [T]he only evidence in this case are the responses of the witnesses on the witness stand during their direct and cross-examination and any full exhibits that are in evidence."
After closely examining the prosecutor's closing remarks in light of the record, and after considering the cautionary instruction imparted by the trial justice, it is our opinion that the prosecutor did not drift outside the bounds of proper prosecutorial conduct by suggesting that the jury draw a reasonable inference from the medical examiner's testimony.
3
The Prosecutor's Characterization of Defense Strategy
During her closing arguments, Roscoe's defense counsel argued that evidence of sexual assault was lacking and that the prosecution's case necessarily depended on the inference that an eighty-five year old widow simply would not have engaged in consensual sexual relations with a man fifty years her junior. This inference, she argued, was out of step with modern society.[5] In response to defense counsel's suggestion in this respect, the prosecutor told the jury during the state's closing argument, "And I apologize for being angry but I'm tired of this victim being called a slut the whole trial." Later, he added, "I make faces. My wife yells at me all the time. I can't play polka [sic ] and I get upset. An 85-year old woman, serious health condition, urinary tract infection, being called a whore."
This type of coarse and vulgar verbiage is simply unacceptable and has no place in the courtrooms of this state. Perhaps more *1240 importantly, the prosecutor's comments were untethered to the record. In the absence of injuries typical of a violent sexual assault, defense counsel asked the jury to consider that Mrs. Mouchon and defendant may have engaged in consensual intercourse. At best, the prosecutor mischaracterized this defense as an attack on Mrs. Mouchon, and then inappropriately expressed his personal anger at the very mischaracterization that he had concocted. At worst, the prosecutor launched an ad hominem attack on the defendant, demonizing him in an effort to arouse the jury's passions.
We have repeatedly condemned "ad hominem attacks that solely 'serve to demonize a particular defendant.' " Barkmeyer , 949 A.2d at 1007 (quoting State v. Horton , 871 A.2d 959, 965 (R.I. 2005) ). We have held that:
"A guilty verdict must be based upon the evidence and the reasonable inferences therefrom rather than on 'an irrational response that [sic ] may be triggered if the prosecution unfairly strikes an emotion in the jury.' Appeals to the jurors' sympathy or emotions are to be rejected because they go beyond the facts of the case and the reasonable inferences to be drawn from such facts." State v. Mead , 544 A.2d 1146, 1150 (R.I. 1988) (quoting DeShields v. State , 534 A.2d 630, 642 (Del. 1987) ).
Although "there is no formula in law which precisely delineates the proper bounds of a prosecutor's argument," Tucker , 111 A.3d at 388, we can say with confidence that the comments employed in this case exceeded propriety and were well outside any reasonable standard.
We are mindful that the trial justice gave a cautionary instruction after closing arguments regarding the words used by the prosecutor. Further, it cannot be gainsaid that we have held that a prosecutor's inappropriate remarks may be harmless error in the face of "overwhelming evidence of the defendant's guilt" and adequate cautionary instructions. State v. Simpson , 658 A.2d 522, 528 (R.I. 1995). Nonetheless, it is our opinion that, in this case, the prosecutor's remarks were unacceptable and crossed the line. However, because we vacate the judgment and remand this case for a new trial on other grounds, we need not, and will not, decide if the inappropriate remarks were sufficient to require that defendant's conviction be vacated. We caution the state to avoid inflammatory ad hominem attacks in future proceedings.[6]
B
The Medical Examiner's Testimony
The defendant next argues that the trial justice erred when he admitted the expert testimony of the medical examiner, Dr. Garrity, with respect to the manner of death. This is so, he argues, because Dr. Garrity relied on anecdotal history and the results of the police investigation when he determined that the manner of Mrs. Mouchon's death was homicide.
Rule 702 of the Rhode Island Rules of Evidence permits expert witnesses to testify about their scientific, technical, or specialized knowledge if their doing so will assist the trier of fact. We previously have stated that "the jury will benefit from expert testimony when 'the subject matter of the inquiry is one involving special skills and training beyond the ken of the average layman.' " State v. Castore , 435 A.2d 321, 326 (R.I. 1981) (quoting Barenbaum v. Richardson , 114 R.I. 87, 90, 328 A.2d 731, 733 (1974) ). On the other hand, "[i]f all the facts and circumstances *1241 can be accurately described to a jury and if the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as is the expert, there is no necessity for the expert testimony." Barenbaum , 114 R.I. at 90-91, 328 A.2d at 733. A medical examiner's conclusions as to the cause and manner of death in a particular case will assist the jury when those conclusions are based on a "strong, independent foundation[,]" such as autopsies, examinations of the decedent's body, and other physical evidence, State v. Mattatall , 603 A.2d 1098, 1116 (R.I. 1992), as well as the exercise of the examiner's "scientific, technical, or other specialized knowledge" in interpreting their findings. R.I. R. Evid. 702. Ultimately, however, the admission of expert testimony lies within the wide discretion of the trial justice, whose "rulings will not be disturbed unless they are clearly erroneous." State v. Griffin , 691 A.2d 556, 558 (R.I. 1997).
To address defendant's argument, we must determine whether a medical examiner may opine as to a decedent's manner of death if that determination relies on the statements of lay witnesses and the results of police investigations in addition to the findings based on his or her medical examination of the decedent. Because an anecdotal history of a decedent's death is often helpful in making a sound determination as to manner of death, and because it cannot be said that Dr. Garrity relied solely or primarily on information relayed to him by the police, we cannot agree with defendant that the trial justice erred by admitting Dr. Garrity's testimony.
After an initial external examination of the decedent's body, Dr. Garrity performed a more extensive examination and a detailed autopsy, in which he catalogued evidence of external injuries and examined internal organs for signs of disease. He testified that the autopsy revealed several injuries to Mrs. Mouchon's head, face, and left breast, a urinary tract infection, an enlarged heart, and fluid around her lungs, but none of the usual defensive injuries one might expect to see on a victim of a violent crime. Based on his findings, the medical examiner concluded that the cause of death was "[b]asically a heart attack or a cardiac arrest following a traumatic event[,]" namely "[m]ultiple blunt force injuries about the face, left breast." Doctor Garrity was at that point unable to opine as to the manner of death, however, until he learned that laboratory testing of the evidence collection kit indicated the presence of sperm in Mrs. Mouchon's body and that witness statements indicated she had not been in a relationship.
Roscoe argues that a medical examiner's conclusions do not assist the trier of fact when they are based on witness statements and the results of a police investigation because this extrinsic information is just as easily understood by a jury, without the need for expert testimony. In Castore , we considered the admissibility of a physician's expert testimony regarding his opinion that the complainant had been molested. Castore , 435 A.2d at 325. The physician testified at trial that he had taken a history from the complainant, including the circumstances surrounding an alleged assault, before he conducted a general and pelvic examination and tested items of clothing. Id. The physician reported that the results of all tests and examinations were normal. Id. Despite those findings, however, the physician testified that, "based upon the history that the patient had given there was sufficient reason to reach a conclusion that child abuse may, in fact, have occurred * * *." Id. We observed that the physician's opinion "was based, not upon his examination of [the complainant] or upon laboratory tests, but solely on what she had related to him about what went on within the walls of the Castore home." Id. at 326. We held that *1242 such an opinion, based solely on what the complainant had related to the physician, was an impermissible comment on a witness's credibility. Id.
In resolving this issue, we have the benefit of jurisprudence in other states. Some courts have held expert testimony to be inadmissible when it relies too heavily on witness statements and other anecdotal information. In State v. Tyler , 867 N.W.2d 136 (Iowa 2015), a medical examiner was able to determine neither the cause nor the manner of death after examining the body of a deceased infant and after conducting an autopsy. Tyler , 867 N.W.2d at 148. In his final report, however, the medical examiner cited the mother's statement to police that she had given birth to a live child in a motel room and that she had then placed the infant in a bathtub filled with water to support his conclusion that the cause of the infant's death was drowning and the manner of death was homicide. Id. at 163. At a hearing on a motion in limine , the medical examiner "admitted the only way he reached his final opinions was by reference to [the mother's] statements to police[,]" and at trial he said, "[W]ithout the witness statements, I could not have diagnosed drowning in this case." Id. at 163-64. The Supreme Court of Iowa noted that the medical examiner "based his opinions primarily, if not exclusively, on [the mother's] inconsistent and uncorroborated statements to police." Id. at 167. His opinions, therefore, "were not sufficiently based on scientific, technical, or other specialized knowledge and therefore did not assist the trier of fact." Id.
Similarly, in State v. Sosnowicz , 229 Ariz. 90, 270 P.3d 917 (App. 2012), the Arizona Court of Appeals ruled that the testimony of a medical examiner was inadmissible because his determination as to manner of death was based largely on the statements of lay witnesses. Sosnowicz , 270 P.3d at 924-25. In that case, an exchange of insults and a parking lot brawl turned deadly when the defendant struck the victim with his vehicle. Id. at 919. There was no dispute that the defendant was driving the vehicle that collided with the victim, and the issue at trial was whether that collision was intentional and amounted to murder or was merely an unfortunate accident. Id. at 921. The medical examiner concluded that the decedent's manner of death was homicide based on the results of the autopsy that he conducted as well as the information reported to him by police. Id. The court opined that "it does not appear that [the medical examiner] relied on any 'specialized knowledge' to classify the death as a 'homicide' rather than an 'accident.' " Id. at 922. These conclusions, the court held, were based "largely on the testimony of lay witnesses whose credibility the jury can determine without the aid of expert testimony[,]" and, thus, the expert's testimony would not assist the jury in understanding the evidence. Id. at 925.
The Supreme Judicial Court of Maine reached a similar conclusion in State v. Vining , 645 A.2d 20 (Me. 1994). In that case, a medical examiner testified that the decedent's manner of death had been homicide, despite conceding "that there was no physical evidence that [the decedent's] death had been caused by a human agent as opposed to an accidental fall." Vining , 645 A.2d at 20-21. The court held that the medical examiner's opinion "was based solely on her discussions with the police investigators and therefore amounted to an assessment of the credibility and investigatory acumen of the police." Id. at 21.
However, in State v. Commander , 396 S.C. 254, 721 S.E.2d 413 (2011), the Supreme Court of South Carolina held that anecdotal histories are at times essential to a medical examiner's interpretation of autopsy *1243 findings. Commander , 721 S.E.2d at 419-20. In that case, the decedent was discovered covered by a blanket, lying on a sofa in her home. Id. at 415. After examining the partially decomposed body, the medical examiner found no marks or other evidence of injury; but, after learning about the "suspicious circumstances" in which the body was found, the medical examiner determined the cause of death to be asphyxiation and the manner of death to be homicide. Id. at 415-16. The medical examiner testified that he based his conclusions on the results of his autopsy and the anecdotal history of the body's discovery. Id. The medical examiner explained during cross-examination that "[t]he history is vital and a mandatory part of all autopsies * * *. [W]ithout a history, the autopsy, in and of itself, is invalid. The two are not separable, they are part of one another. The autopsy includes the history as well as all the other anatomic and laboratory findings." Id. at 420. The court agreed, holding that, "[b]ecause the anecdotal history is an essential component of any autopsy, we find testimony concerning findings based on this information falls within the umbrella of the expert's specialized knowledge." Id.
The cited cases are largely in line with our own reasoning in Castore , and together they suggest that an expert's opinion will not be admissible if it relies solely or primarily on witness statements that are within the ken of the jury. We recognize, however, that medical examiners do not conduct their examinations in a vacuum. We are persuaded by the reasoning in Commander and agree that an understanding of the circumstances surrounding the death and discovery of a deceased person is an important component of any determination of cause or manner of death. Indeed, medical examiners have a statutory duty to inquire into these circumstances. General Laws 1956 § 23-4-8(a) provides, in relevant part:
"When the office of state medical examiners has notice that there has been found or is lying within this state the body of a person who is supposed to have come to his or her death by violence * * * an agent of the office of state medical examiners shall immediately proceed to the place where the body lies and take charge of it, view it, and make personal inquiry into the cause and manner of death." (Emphasis added.)
We therefore conclude that medical examiners may supplement their medical findings with other information to assist them in interpreting their findings in the exercise of their "scientific, technical, or other specialized knowledge[,]" R.I. R. Evid. 702, so long as they do not rely solely or primarily on such information.[7] It is for the trial justice, based on the particular facts and circumstances of the case before him, to determine whether a medical examiner has relied too heavily on witness statements such that the testimony amounts to an impermissible comment on the witness's credibility. We do not disturb such findings on appeal unless they are clearly erroneous. See Griffin , 691 A.2d at 558.
In this case, the trial justice ruled that Dr. Garrity's opinion as to the manner of death was within his area of expertise and that his testimony would assist the jury in its fact finding function. In our opinion, allowing Dr. Garrity to testify about his consideration of witness statements was not clearly erroneous, because *1244 he did not rely solely or primarily on those statements. At trial, Dr. Garrity testified that he catalogued extensive injuries to Mrs. Mouchon's head, face, and left breast-injuries that he did not believe were consistent with falling-and that those blunt force injuries likely caused Mrs. Mouchon's already-compromised heart to fail. He also testified that, at the time of her death, Mrs. Mouchon was suffering from a urinary tract infection and that the inflammation and pain from that infection would certainly dampen any desire for sexual intercourse. The statements of acquaintances to the effect that Mrs. Mouchon had not been involved in a relationship may have assisted Dr. Garrity to arrive at the conclusion that Mrs. Mouchon's manner of death was homicide, but we cannot say that Dr. Garrity's conclusion was based solely, or even primarily, on those statements.
Roscoe also argues that Dr. Garrity's testimony should have been excluded under Rule 403 of the Rhode Island Rules of Evidence, because Dr. Garrity's determination that Mrs. Mouchon's manner of death was by homicide was likely to confuse jurors who might have equated the medical term "homicide" with the legal charge of murder. We do not agree. Again, as we acknowledged in Mattatall , where police believe that violence may have caused the death of an individual, a medical examiner is obliged by § 23-4-8 to "immediately proceed to the place where the body lies and take charge of it, view it, and make personal inquiry into the cause and manner of death." See Mattatall , 603 A.2d at 1115 (quoting the predecessor statute to § 23-4-8, with minor linguistic deviations). As we noted in that case, where a medical examiner has determined the cause and manner of death, the jury has every right to hear the medical examiner's opinion and to assign that testimony the appropriate weight in furtherance of their function as factfinder. Id. at 1116.
The admission of Dr. Garrity's testimony with regard to the manner of death was not clearly erroneous, and we will not disturb the trial justice's ruling.
C
Violations of the Confrontation Clause
Roscoe next argues that allowing Det. Bousquet[8] to testify about his conversations with Henriette Van Coughen, Anna Blais, and George Mouchon violated his Sixth Amendment right to confront the witnesses against him. He also points to the state's closing argument as allowing the content of out-of-court statements made by unavailable witnesses to be "readily inferred" by the jury. He contends that this violated his right to confront the witnesses against him, in violation of the Sixth Amendment to the United States Constitution and article 1, section 10 of the Rhode Island Constitution. Because we agree that the Confrontation Clause was violated when the state implicitly conveyed the content of statements made by deceased witnesses to the jury, both through Det. Bousquet's testimony and the closing argument of the prosecutor, and because we cannot say that those violations were harmless beyond a reasonable doubt, we are constrained to vacate the judgment of conviction.
"When a criminal defendant claims on appeal that the introduction of certain evidence violated his constitutional rights of confrontation and cross-examination, we review such an evidentiary ruling in a de novo manner." State v. Moten , 64 A.3d 1232, 1238 (R.I. 2013). "Both the Sixth Amendment to the United States Constitution (through the Fourteenth Amendment) and article 1, section 10, of the Rhode Island Constitution guarantee *1245 individuals accused of criminal charges the right to confront and cross-examine any adverse witnesses who testify against them." State v. Dorsey , 783 A.2d 947, 950 (R.I. 2001). Violations of the Confrontation Clause are subject to harmless-error analysis. State v. Albanese , 970 A.2d 1215, 1222 (R.I. 2009). The inquiry is whether, assuming the defense had been afforded the opportunity to cross-examine the unavailable witness and that "the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Id. (quoting State v. Pettiway , 657 A.2d 161, 164 (R.I. 1995) ).
Analysis of DNA recovered from sperm at the scene of Mrs. Mouchon's death established a very high probability that defendant had had sexual contact with Mrs. Mouchon before her death. The key issue at trial was whether or not that sexual contact had been consensual. Following the discovery of sperm during the original 1990 investigation into Mrs. Mouchon's death, West Warwick police questioned several witnesses in an effort to learn whether Mrs. Mouchon had been involved in a relationship at the time of her death. Unfortunately, several of those witnesses passed away in the decades between that investigation and Roscoe's 2016 trial, including her son, George Mouchon, as well as Anna Blais and Henriette Van Coughen.
During the direct examination of Det. Bousquet, who had been the lead investigator in 1990, the prosecution inquired about the steps taken to determine the extent of Mrs. Mouchon's romantic attachments, if any:
"[THE STATE:] Did you re-interview George Mouchon?
"[DET. BOUSQUET:] I did.
"* * *
"* * *
"[THE STATE:] And in general terms, did you ask him if he knew if his mother was in a relationship?
"[DET. BOUSQUET:] I did.
"[THE STATE:] Did you interview Henriette Van Coughen?
"[DET. BOUSQUET:] Yes, sir.
"[THE STATE:] And had you determined that Mrs. Van Coughen knew Mrs. Mouchon?
"[DET. BOUSQUET:] Yes.
"* * *
"* * *
"[THE STATE:] And did you ask her if she knew if Mrs. Mouchon was in a relationship?
"[DET. BOUSQUET:] Yes.
"[THE STATE:] Did you interview Anna Blais?
"[DET. BOUSQUET:] Yes, sir.
"* * *
"* * *
"* * *
"* * *
"[THE STATE:] * * * Did you ask Mrs. Blais if she knew whether Mrs. Mouchon was in a relationship?
"[DET. BOUSQUET:] I did."
The prosecutor later referred to that testimony, highlighting it during the course of his closing argument:
"[Police] go to speak to her son, George Mouchon. Was your mother in a relationship? They go to speak to Anna Blais, her next door neighbor. Was Mrs. Mouchon in a relationship? They go to speak to Henriette VanCoughen. Was Mrs. Mouchon in a relationship? They go to speak to Lionel Russi. Was she in a relationship? Don't you think they would have followed up?"[9]
In our opinion, this line of questioning introduced testimonial evidence *1246 against defendant. The United States and Rhode Island Constitutions bar the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Crawford v. Washington , 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ; see Albanese , 970 A.2d at 1222. A statement is testimonial if its "primary purpose * * * is to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington , 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Testimonial statements include those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]" Crawford , 541 U.S. at 52, 124 S.Ct. 1354.
The state concedes that the statements made to police by Anna Blais, Henriette Van Coughen, and George Mouchon were testimonial, and therefore triggered Confrontation Clause considerations. Although the actual words spoken by the now-deceased witnesses were not themselves elicited at trial, the content of their statements-that Mrs. Mouchon had not been involved in a relationship-was "readily inferred." United States v. Kizzee , 877 F.3d 650, 657 (5th Cir. 2017) (quoting Favre v. Henderson , 464 F.2d 359, 362 (5th Cir. 1972) ).
In Kizzee , the defendant was charged with multiple drug-related federal offenses. Kizzee , 877 F.3d at 655. Investigating officers arrested a man named Carl Brown after he was seen leaving the defendant's home. Id. at 654. Although Brown told police that he had purchased narcotics from Kizzee, he later recanted his statements and declined to testify at the defendant's trial. Id. The prosecution asked a testifying detective whether he had asked Brown if he had purchased narcotics from the defendant, but he did not elicit Brown's response to the detective's question. Id. at 655, 657. The prosecution then asked the detective if he had taken any actions as a result of Brown's statement, and the detective testified that he had obtained a search warrant for the defendant's home. Id. at 655. Although at no point during his testimony did the detective reveal the words of Brown's statement, the Fifth Circuit held that the prosecutor's questions to the detective "appeared designed to elicit hearsay testimony without directly introducing Brown's statements." Id. at 657-58. The court went on to conclude that, because the out-of-court statements of a nontestifying declarant could be "readily inferred[,]" the defendant's Sixth Amendment right to confront the witnesses against him had been violated. Id. at 658-59.
In this case, Det. Bousquet testified that he had interviewed Anna Blais, Henriette Van Coughen, and George Mouchon and that he asked each of them whether they knew if Mrs. Mouchon had been involved in a relationship. Although their answers to these questions were not elicited directly at trial, the jury was left with the unavoidable implication that each of these individuals had told police they did not believe Mrs. Mouchon was in a relationship. This inference was reinforced during the prosecutor's closing argument, when he recalled Det. Bousquet's testimony and asked the jury, "Don't you think they would have followed up?"
We agree with those courts that have held the Confrontation Clause applies with full force when the jury can readily infer the contents of untested out-of-court testimonial statements. See *1247 Kizzee , 877 F.3d at 657 ("[A] prosecutor's questioning may introduce a testimonial statement by a nontestifying witness, thus implicating the Confrontation Clause."); United States v. Meises , 645 F.3d 5, 21 (1st Cir. 2011) ("[I]f what the jury hears is, in substance, an untested, out-of-court accusation against the defendant, particularly if the inculpatory statement is made to law enforcement authorities, the defendant's Sixth Amendment right to confront the declarant is triggered."); see also Ocampo v. Vail , 649 F.3d 1098, 1111 (9th Cir. 2011) ; Ryan v. Miller , 303 F.3d 231, 249 (2d Cir. 2002). The Confrontation Clause ensures the right of defendants "to tease out the truth" by questioning the reliability of the witnesses against them. Crawford , 541 U.S. at 67, 124 S.Ct. 1354. Were we to hold otherwise, we would deprive defendants of this important truth-finding function.
The state argues that, even if the statements of Blais, Van Coughen, and George Mouchon could be readily inferred from Det. Bousquet's testimony, those statements did not run afoul of the Confrontation Clause because they did not directly implicate defendant. According to the state, those statements can only support the inference that Mrs. Mouchon was not in a relationship at the time of her death. While this inference might lead to the further inference that sperm found with Mrs. Mouchon was a result of a sexual assault rather than consensual sexual contact, the state maintains, it did not directly or indirectly inculpate Roscoe in that crime. In other words, the state maintains that only when weighed in combination with DNA evidence did those witnesses' statements in any way incriminate Roscoe in the crime of sexual assault. However, in Melendez-Diaz v. Massachusetts , 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the United States Supreme Court was not persuaded by that very argument, reasoning that the Sixth Amendment "contemplates two classes of witnesses-those against the defendant and those in his favor. * * * [T]here is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." Melendez-Diaz , 557 U.S. at 313-14, 129 S.Ct. 2527.
That reasoning applies here with full force. Although it is true that the statements of the now-deceased declarants do not directly identify or implicate Roscoe, the statements were nonetheless employed in an effort to prove that defendant's DNA was present as the result of nonconsensual sexual contact. Anna Blais, Henriette Van Coughen, and George Mouchon were therefore witnesses against the defendant. Their deaths prior to trial deprived Roscoe of the ability to subject them to cross-examination, yet the trial justice nonetheless admitted testimony that referred to their statements to police in 1990. In our opinion, this was error.
It is further our opinion that this error was not harmless beyond a reasonable doubt. The state was tasked with proving that any sexual contact between Roscoe and Mrs. Mouchon was nonconsensual. However, there were no signs of forced entry into Mrs. Mouchon's apartment, there were no defensive wounds on Mrs. Mouchon's hands, and vaginal injuries were not present. We therefore cannot say that, had "the damaging potential of the cross-examination [been] fully realized," no reasonable jury could have acquitted the defendant.[10] Albanese , 970 A.2d at 1222.
*1248 III
Conclusion
For the foregoing reasons, we hold that the introduction of out-of-court statements of deceased declarants violated the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution. Therefore, we vacate the judgment of conviction and remand the case to the Superior Court for new trial.

Defense counsel did not object to this question, nor was there a motion to strike the resulting answer by the medical examiner.

In her closing remarks to the jury, defense counsel made a reference to the 1990s television program "Golden Girls," which depicted the energetic and sometimes randy exploits of four elderly women.

We realize that the prosecutor in this case is seasoned and well respected, and thus we chalk up his inappropriate remarks to a sudden burst of overzealous advocacy.

"We believe that the medical examiner should not be required to close his eyes to sources of information relied upon by mankind generally in order to determine the questions that must be resolved in his official capacity." State v. Dame , 488 A.2d 418, 426 (R.I. 1985) ; see also State v. Correia , 600 A.2d 279, 286 (R.I. 1991).

Detective Bousquet was long-retired at the time of his testimony.

We note that the record indicates that Det. Bousquet in fact did not interview Lionel Russi, who died during the course of the investigation.

Defendant also appealed his convictions for both felony murder and first degree sexual assault on the grounds that these dual convictions amounted to double jeopardy. The state agreed in its brief before this Court that double jeopardy principles prevent the conviction of murder under the felony-murder theory alongside the underlying felony, in this case, first degree sexual assault. Because we vacate the judgment of conviction on other grounds, we need not, and do not, reach this argument.