**Supreme Court**

No. 2012-176-C.A.

(P2/11-1196A)

State                    :

v.                       :

DeAnthony Allen.         :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                        :

v.                         :

DeAnthony Allen.         :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**   On November 10, 2011, a Providence County Superior Court jury found the defendant, DeAnthony Allen, guilty of first degree child abuse for inflicting serious bodily injury on his infant son in violation of G.L. 1956 § 11-9-5.3(b)(1).  The trial justice imposed upon the defendant the maximum sentence allowed under that law—twenty years to serve.

On appeal, defendant contends that the charge against him should have been dismissed because the child abuse statute (viz., § 11-9-5.3) is unconstitutionally vague.  He also argues that the trial justice erred when he admitted a statement that defendant wrote at the police station; defendant contends that he did not knowingly and voluntarily waive his Miranda rights[1] before providing that statement.  Finally, defendant argues that the trial justice erred in denying his motion for a judgment of acquittal and his motion for a new trial.  For the reasons set forth in this opinion, we affirm the judgment of conviction.

---

[1]     Miranda v. Arizona, 384 U.S. 436 (1966).

# I

## Facts and Travel

On April 28, 2011, the state charged defendant, DeAnthony Allen, by criminal information with one count of first degree child abuse in violation of § 11-9-5.3(b)(1); that criminal charge related to an incident that occurred in November of 2010. On November 8, 2011, defendant filed two pretrial motions, both of which are relevant to this appeal. One was a motion to suppress statements that defendant had made to the Pawtucket police because, according to defendant, "they were obtained through violations of the United States and Rhode Island Constitutions." The second motion contended that the criminal information should be dismissed because the statute under which defendant was charged (viz., § 11-9-5.3) was unconstitutionally vague.

At a hearing on the pretrial motions, the court first addressed defendant's motion to suppress. Only one witness testified at the hearing: Linda Bachand-Doucet, a detective in the Pawtucket Police Department who investigated the incident that led to the criminal charge against defendant. At the hearing, Det. Bachand-Doucet testified regarding the following version of events.

On November 14, 2010, Det. Bachand-Doucet went to Hasbro Children's Hospital after receiving instructions to investigate an incident of alleged child abuse. After speaking with a physician at the hospital, a representative of the Department of Children, Youth and Families, and the infant's mother, the detective tried to reach defendant by telephone, but was unsuccessful. However, two days later, defendant called Det. Bachand-Doucet back, and she told him that the police "needed to talk to him about the baby." The defendant came to the Pawtucket police station by bus that same day, arriving at noon.

Once defendant arrived at the police station, Det. Bachand-Doucet brought him into a conference room, where she asked him what his level of education was; defendant told her that he had dropped out of high school. The detective said that defendant was eighteen years old as of the day he came to the police station.

Detective Bachand-Doucet gave defendant a "rights form" that set forth the <u>Miranda</u> warnings. At 12:05 p.m., Det. Bachand-Doucet had defendant read those rights out loud; she also had him mark his initials next to each of his rights "to make sure he underst[ood]." The rights form included a line that defendant "checked off" to indicate that he understood his rights. After defendant read his rights, Det. Bachand-Doucet watched him sign the document. Detective Bachand-Doucet testified that defendant never said that he did not understand the rights which he had read out loud; he also never asked her any questions about those rights. She said that it took defendant "less than five minutes" to complete the rights form.

After defendant had read and signed the rights form, Det. Bachand-Doucet "asked him what happened." She engaged in a brief conversation with defendant about the incident that she was investigating, and then defendant wrote and signed a statement that was eventually admitted as a full exhibit and read to the jury at trial. The detective said that it took defendant "maybe ten or fifteen minutes" to write the statement; she added that the statement was taken at 12:20 p.m.—approximately fifteen minutes after defendant had read his rights.

The motion justice ruled on the motion to suppress from the bench. He stated that he found the sole witness, Det. Bachand-Doucet, to be "nothing but credible." The motion justice was "completely satisfied" that the police "properly advised * * * defendant of his rights under <u>Miranda v. Arizona</u>." The motion to suppress was therefore denied.

As for the motion to dismiss, defense counsel stated that his "void for vagueness" challenge would depend on "the facts in this particular case," and therefore he reserved his argument until after the evidence was presented at trial.

The defendant's two-day jury trial began on November 9, 2011. As its first witness, the state called the infant's mother, Stephanie Marks. She testified that, on Thursday, November 11, 2010, she left her son in defendant's care for the weekend while she went to work as a caretaker in Tiverton. She told the jury that she received a call from defendant between 5 and 5:30 a.m. on Sunday, November 14, 2010, and that defendant told her that the infant "wasn't acting right." Ms. Marks stated that she thought it was just a "typical baby situation where the baby was sick or [was] just being fussy because he's only four months old." She testified that she told defendant to "soothe" their son and to "do what a parent's suppose[d]" to do.

Ms. Marks went on to testify that she received a second call from defendant around 6:30 or 7 a.m. on Sunday, in which defendant indicated that "everything was fine." She stated that she then received a third call from defendant around 9:30 or 10 a.m., during which defendant told her that their son was not "acting right" and that he was "breathing weird" and was "starting to get really hot." Ms. Marks told the jury that she "started panicking." She testified that she then drove from Tiverton to Memorial Hospital. At Memorial Hospital, she was told that her son was being transferred to Hasbro Children's Hospital because "he was having extremely bad seizures, he was having internal bleeding to the brain, and * * * he couldn't breathe right on his own." She told the jury that, after asking defendant what happened to their son, he told her that he had grabbed the baby's legs as he was falling off the bed and that "the baby's head skimmed the floor."

When asked how her son was doing at the time of trial, Ms. Marks replied:

"He's doing good. It's just hard. He's a disabled baby now. He can't see. He has special equipment. He goes to early interventions, EACs, nonstop therapist on a weekly basis, every day there's something he has to be doing."

The prosecutor also offered the testimony of Dr. Brett Slingsby—one of the physicians who had treated the infant at Hasbro. Doctor Slingsby testified as both a fact witness and as an expert in pediatric medicine with an emphasis on child abuse. Doctor Slingsby stated that, on November 14, 2010, he was called into the hospital "because there was concern for abuse of" the infant. He stated that, when he initially examined the infant, he observed multiple bruises on his head and bleeding within his mouth. Doctor Slingsby also testified that tests revealed "new blood" in the tissue layer between the infant's skull and brain. He responded affirmatively when asked whether the injury was "consistent with head trauma syndrome or with shaking." He stated that x-rays further revealed that the infant had multiple fractures in his ribs on both the right and left sides, which he agreed were "consistent with * * * squeezing or pressure to the chest." Doctor Slingsby testified that he also consulted with an ophthalmologist, who found retinal hemorrhaging "behind both eyes from the inside all the way out to the sides of both eyes."

Doctor Slingsby told the jury that, in his opinion, the infant "was a victim of physical abuse as well as abusive head trauma."

The prosecutor also called Det. Bachand-Doucet to testify before the jury. After the detective reiterated the substance of much of the testimony that she had provided during the hearing on the motion to suppress, the defendant's statement was admitted as a full exhibit. That statement reads as follows:

> "Thursday my girl friend [Stephanie Marks] left for work and I was with the kids by myself. My daughter had left with her aunt friday night then it was just me and [my son] in the house. Saturday night he was buggin out[.] I [couldn't] get him to stop crying so I picked him up and I shook him a little and said 'shut the f * * * up.' Then I grabbed his face and squeezed his chin.

- 5 -

After he was still buggin so [I] left him in the room on the bed with a bottle then he was quiet.

"Then [when we were] sleeping he fell, then I picked him up [and] got him to be quiet. The Next morning he wasn't him self, so I called his mom and she said 'Take him to the hospital' so I Did. I squeezed him when I was shakin him and I squeezed him hard because I was frustrated [that] he wouldn't stop cryin."

At the conclusion of the trial, defendant brought his previously filed motion to dismiss to the court's attention, arguing that § 11-9-5.3, "as applied in [the] case, [was] unconstitutionally vague." The court denied the motion. The defendant then moved for a judgment of acquittal; that motion was also denied. The jury returned a guilty verdict within an hour.

On November 14, 2011, defendant filed a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. That motion was denied after a hearing on November 16. The defendant was sentenced to twenty years to serve. He filed a timely notice of appeal.

## II

## Analysis

## A

## The Motion to Dismiss

The defendant first challenges the trial justice's decision to deny his motion to dismiss. He argues that the child abuse statute, § 11-9-5.3 ("Brendan's Law"), is unconstitutionally vague and that, therefore, the motion justice should have dismissed the charges against him. We disagree.

When a party contests the constitutionality of a statute, that party has "the burden of proving beyond a reasonable doubt that the challenged enactment is unconstitutional." State ex rel. Town of Westerly v. Bradley, 877 A.2d 601, 605 (R.I. 2005). In our review of such a

challenge, we "will attach every reasonable intendment in favor of * * * constitutionality in order to preserve the statute." State v. Russell, 890 A.2d 453, 458 (R.I. 2006) (internal quotation marks omitted); see also Cranston Teachers Alliance Local No. 1704 AFT v. Miele, 495 A.2d 233, 235 (R.I. 1985) (noting that holding a statute void for vagueness "is strong medicine that should be employed sparingly and only as a last resort").

A criminal statute will be declared void for vagueness under the Fourteenth Amendment's Due Process Clause when that statute is so vague that people "of common intelligence must necessarily guess at its meaning and differ as to its application." State v. Stierhoff, 879 A.2d 425, 435 (R.I. 2005) (internal quotation marks omitted). Challenges based on a statute's vagueness "rest principally on lack of notice." Id. (internal quotation marks omitted). This Court has therefore held that "[a]bsent some other constitutional concern,[2] if the facts show that a defendant is given sufficient notice that his conduct is at risk we see no reason to speculate whether the statute notifies a hypothetical defendant." State v. Sahady, 694 A.2d 707, 708 (R.I. 1997) (citing Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc., 455 U.S. 489, 500 (1982)). In other words, a vagueness challenge based solely on the Due Process Clause "must be examined in the light of the facts of the case at hand." State v. Fonseca, 670 A.2d 1237, 1240 (R.I. 1996) (quoting United States v. Mazurie, 419 U.S. 544, 550 (1975)).

The defendant argues that § 11-9-5.3 is unconstitutionally vague "because the conduct proscribed * * * [is] indistinguishable between first and second degree child abuse." Any purported ambiguity arising from the similarity between first and second degree child abuse, however, is irrelevant to this case because defendant was charged with (and convicted of) only

---

2    If a defendant's vagueness challenge implicates First Amendment freedoms, then a different analysis will apply. See, e.g., State ex rel. City of Providence v. Auger, 44 A.3d 1218, 1232 (R.I. 2012). The defendant in this case, however, has not raised any such issues.

first degree child abuse. Our inquiry, therefore, is limited to whether the first degree child abuse charge is unconstitutionally vague in regard to defendant's specific conduct. See Fonseca, 670 A.2d at 1240.

It is our opinion that § 11-9-5.3 clearly provided defendant with notice that his conduct was unlawful. A person is guilty of first degree child abuse if he or she inflicts "serious bodily injury" upon a child while the child is within that person's care. The statute goes on to specifically define "serious bodily injury" as:

> "[P]hysical injury that:
>
>> "(1) Creates a substantial risk of death;
>>
>> "(2) Causes protracted loss or impairment of the function of any bodily parts, member or organ, including any fractures of any bones;
>>
>> "(3) Causes serious disfigurement; or
>>
>> "(4) Evidences subdural hematoma, intercranial hemorrhage and/or retinal hemorrhages as signs of 'shaken baby syndrome' and/or 'abusive head trauma.'" Section 11-9-5.3(c).

There is nothing unconstitutionally vague about the proscribed conduct in these provisions. The statute does not create a situation where "the innocent may be trapped by inadequate warning of what the state forbids." See State v. Authelet, 120 R.I. 42, 45, 385 A.2d 642, 644 (1978). Based on the evidence presented at trial, the infant suffered injuries that fell squarely within the specific definition of "serious bodily injury" provided by the General Assembly. We therefore hold that the trial justice correctly denied defendant's challenge to the constitutionality of § 11-9-5.3.

**B**

**The Motion to Suppress**

Next, defendant contends that his written statement to the police should not have been entered into evidence because he did not "knowingly" and "voluntarily" waive his Miranda rights. Again, we disagree.

When reviewing a motion to suppress based on an alleged violation of a defendant's constitutional rights, "this Court must make an independent examination of the record to determine if [the defendant's] rights have been violated." State v. Goulet, 21 A.3d 302, 311 (R.I. 2011) (internal quotation marks omitted). As part of our analysis, we must "view the evidence in the record in the light most favorable to the state." Id. Accordingly, we will reverse a motion justice's ruling only if "(1) his or her findings concerning the challenged statements reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." State v. Grayhurst, 852 A.2d 491, 513 (R.I. 2004) (internal quotation marks omitted).

It has become a fundamental principle of American criminal law that, "prior to custodial interrogation a suspect must receive explicit warnings concerning his constitutional privilege against self-incrimination and his right to counsel." See State v. Amado, 424 A.2d 1057, 1061 (R.I. 1981) (discussing Miranda v. Arizona, 384 U.S. 436, 478–79 (1966)). Before statements made by a defendant during a custodial interrogation may be admitted into evidence, the state "must first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in Miranda v. Arizona." State v. Jimenez, 33 A.3d 724, 733–34 (R.I. 2011) (internal quotation marks omitted).

The defendant contends that the state failed to meet its burden based on the "totality of the circumstances." Specifically, he points out (1) that he was an eighteen-year-old high school dropout at the time he went to the police station and (2) that it took him less than five minutes to complete the "rights form" on which he waived his Miranda rights.

We have indeed recognized that the Miranda inquiry should take into account "the accused's age, experience, education, background, and intelligence to determine whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." State v. Benton, 413 A.2d 104, 109 n.1 (R.I. 1980) (citing Fare v. Michael C., 442 U.S. 707, 725 (1979)). The motion justice in this case took those factors into account. Even though defendant was a high school dropout, Det. Bachand-Doucet testified that defendant was able to read all of the Miranda rights out loud. Further, defendant signed his initials next to each right to acknowledge that he understood those rights; he also "checked off" a line indicating that he understood his rights, and he signed the rights form. See State v. Kryla, 742 A.2d 1178, 1184 (R.I. 1999) (affirming the denial of a motion to suppress where a seventeen-year-old suspect initialed and signed a rights form).

Viewing this uncontradicted evidence in the light most favorable to the state, it is our opinion that the motion justice correctly determined that defendant understood his rights and was aware of the nature of his actions. See Benton, 413 A.2d at 110. Further, we are not troubled by the fact that defendant spent less than five minutes with the rights form. Had the police recited the Miranda rights for him, the process in all likelihood would have been even quicker. Accordingly, after carefully reviewing the entire record, we perceive no error in the motion justice's ruling on the motion to dismiss; accordingly, we affirm that ruling.

**C**

**The Motion for a Judgment of Acquittal
and the Motion for a New Trial**

The defendant's final argument is that the trial justice erred when he denied his motions for a judgment of acquittal and for a new trial. The defendant hinges those arguments, however, on the admissibility of his confession; he states that, "[w]ithout [his] confession, there would have been insufficient evidence to prove the case against him." Since we have already recognized that the motion justice did not err when he allowed the state to introduce the defendant's confession, the defendant's arguments regarding his motions for a new trial and for a judgment of acquittal fail.

**III**

**Conclusion**

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The record in this case may be returned to that tribunal.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      State v. DeAnthony Allen.

**CASE NO:**      No. 2012-176-C.A.
      (P2/11-1196A)

**COURT:**      Supreme Court

**DATE OPINION FILED:**   June 19, 2013

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

      Presiding Justice Joseph F. Rodgers, Jr.  (Ret.)

**ATTORNEYS ON APPEAL:**

      For State:  Lauren S. Zurier
            Department of Attorney General

      For Defendant:  C. Daniel Schrock, Esq.