February 1, 2023

**Supreme Court**

No. 2020-274-C.A.
(P2/16-2326A)

| | |
|---|---|
| State | : |
| v. | : |
| Carlton Vose. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State              :

v.                :

Carlton Vose.        :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.** This case came before the Supreme Court on November 2, 2022, on appeal by the defendant, Carlton Vose (defendant or Vose), from a Superior Court judgment of conviction on six counts of neglecting an adult with severe impairments, in violation of G.L. 1956 § 11-5-12.[1] The defendant was sentenced to concurrent five-year sentences at the Adult Correctional Institutions, with two years to serve and the balance suspended, with probation, a $1,000 fine, counseling upon release from prison, and a no-contact order. On appeal, Vose raises several issues: (1) whether § 11-5-12 is ambiguous as written; (2) whether medical testimony is necessary to establish "severe impairment" under §

---

[1] We begin by acknowledging that there may be circumstances in which the care of an adult with severe impairments can be challenging and outside the parameters of G.L. 1956 § 11-5-12. This is not such a case.

11-5-12; (3) whether the trial justice misapplied the law when he denied defendant's motion for a new trial; and (4) whether the state violated Rule 16 of the Superior Court Rules of Criminal Procedure by failing to provide a witness list before the first day of trial and then by calling less than half of the witnesses who were identified. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## Facts and Travel

The record reveals the following. After living in Florida for many years, defendant returned to Rhode Island in 2014 in order to care for his mother, Pauline Vose, who was suffering from dementia and tended to wander.[2] He previously had been granted Pauline's power of attorney in August 2013. Pauline and defendant shared a home at 314 Kenyon Avenue, Pawtucket, Rhode Island.[3] The defendant was a licensed attorney in the Commonwealth of Massachusetts, working for the Department of Veterans Affairs.

At trial, Anabel Reyes testified that on January 29, 2015, she was working her shift as assistant manager at the Walgreens Pharmacy on Cottage Street, Pawtucket, when Pauline entered the store. Pauline appeared disoriented and upset. Pawtucket

---

[2] Throughout this opinion, we refer to Pauline Vose by her first name solely for the sake of clarity. No disrespect is intended.

[3] We pause to note that Pauline passed away in April 2022.

Police Department Patrol Officer Ronald Jones responded to the Walgreens for a well-being check after Reyes called the police to alert them of her plight.

Officer Jones testified that he spoke with Pauline, who was able to recite her name to him when asked. According to Officer Jones, Pauline appeared somewhat disoriented and confused; she was wearing a robe that was not appropriate for the cold weather at the time. Pauline was transported by Officer Jones to her home on Kenyon Avenue, about 0.7 miles away from the Walgreens. This encounter was among numerous incidents of Pauline wandering outside the home in a confused and frightened mental state. Several such incidents formed the basis for this prosecution.

Officer Jones and Pauline were met at her door by defendant. The defendant told Officer Jones that he was unaware that Pauline had left the home and informed Officer Jones that she was in the early stages of dementia. After escorting Pauline into her home, Officer Jones left the scene.

Pawtucket Police Department Patrol Officer Jeffrey Furtado testified that, days later, on February 9, 2015, he received a dispatch to conduct a well-being check at Sam's Food Mart on Kenyon Avenue in Pawtucket. Officer Furtado observed an older female, later identified as Pauline, wearing a green sweatsuit, and standing outside of the store. Officer Furtado concluded that Pauline was not dressed in garments suitable for the outdoors, as it had snowed the previous evening, and the temperature that day was between twenty and twenty-five degrees. Because of the

weather and the fact that the sidewalks were still not cleared, he transported Pauline back to her home, about 300 to 500 yards away from Sam's Food Mart. Pauline and Officer Furtado entered the home together. According to the officer, the home appeared cluttered and smelled of animal feces and urine. After Officer Furtado announced that a Pawtucket police officer was in the home, defendant opened the second-floor door at the top of the stairwell and acknowledged him. The defendant stated that he was unaware that Pauline had left the home, and he informed Officer Furtado that Pauline was suffering from dementia.

Later that same evening, Allen Desjarlais was plowing Kenyon Avenue for the City of Pawtucket, when Pauline approached his truck waving her arms and banging on his window. Pauline twice advanced towards the truck, asking for a ride. Because it was snowy, dark, and cold, Desjarlais testified, he called his supervisor and requested that the police be called. Pawtucket Patrol Officer Geoffrey Metfooney responded to the scene at approximately 6:00 p.m. to conduct a well-being check. Upon arrival, Officer Metfooney located Pauline standing in the roadway and Desjarlais standing nearby. Because Pauline appeared confused as to her whereabouts, Officer Metfooney escorted her back to her house, which was a short distance away. No one was home when they arrived. Officer Metfooney called defendant and left him a voice mail alerting him to the situation. A report

documenting the events was forwarded to the Pawtucket Police Department Elderly Affairs Division.

Although the record discloses several more police calls for well-being checks over the ensuing months, the next incident introduced at trial occurred on September 18, 2015. Pawtucket Patrol Officer James Leach testified that on that day he responded to a well-being check on Kenyon Avenue, where he met with Kathleen Lavery, a neighbor of Pauline. Ms. Lavery contacted the Pawtucket police after encountering Pauline, who was wet, crying, and shaking. Pauline informed Lavery that defendant had turned the yard faucet on her when she asked for food. Ms. Lavery indicated that Pauline was consistently wandering the neighborhood in soiled clothing, was constantly hungry, and on that day, she was in fear. Officer Leach understood from his conversation with Lavery that Pauline was afraid of her son calling.

Officer Leach then proceeded to Pauline's home, where she answered his knock at the door. Pauline appeared disheveled, wearing wet, dirty clothing. The house was also disorderly, and the only food that he could locate were a couple of packages of frozen corn and dog food. Pauline did not want Officer Leach to contact defendant and appeared to be very fearful that he would do so. Officer Leach then spoke with defendant, who had been on the second floor of the residence. The defendant told him that he does not keep food in the house because Pauline would

feed all the animals in the neighborhood. He also informed Officer Leach that Pauline was suffering from dementia.

Sergeant Joseph Skahan testified that, the following month, on October 24, 2015, he was directed to the intersection of Benefit Street, Kenyon Avenue, and Mendon Avenue, where he encountered Pauline standing in the roadway. She was wearing thin clothing that was inappropriate for the weather and appeared disheveled and unsteady on her feet. Pauline was confused and unable to provide basic identifying information. Sergeant Skahan took Pauline to her house, where she gained entry without a key. The house was in a disorderly state, with garbage and open bags of animal food throughout, and urine-soaked newspapers on the floor. Because Pauline appeared hungry, Sgt. Skahan attempted to find food in the house for her to eat, but he located only condiments in the refrigerator and open bags of animal food in the cabinets. He sought out a phone but could only find one that was not plugged into the wall due to a broken phone jack.

Sergeant Skahan attempted to contact defendant, unsuccessfully, through dispatch, leaving a message at about 1:30 p.m. in order to speak with him about the situation. Sergeant Skahan then called for a rescue for Pauline, at which time she was transported to the hospital. Vose contacted Sgt. Skahan around 3:00 p.m.; as Sgt. Skahan began to describe his mother's condition, Vose became belligerent, demanding that the police stay out of his house and leave his mother alone. After

defendant was told that his mother was found wandering the streets, his response was that it was not a crime to do so.

Finally, on November 3, 2015, Martha Crippen,[4] then an elder abuse investigator for the Office of Attorney General, responded to Pauline's home with Sergeant Christopher Dupont of the Pawtucket Police Department, a caseworker from the Division of Elderly Affairs,[5] and a staff member from Gateway Health. Upon arrival, they found Pauline wandering the street, dressed in dirty clothing that was inadequate for the frigid weather. Although she was very close to her home, she was unsure where she lived.

Pauline was brought to her house, which was found to be untidy with the smell of urine permeating the air. The overall condition of the home was deplorable, according to the witnesses. The group found a cup of cold coffee, a piece of cold toast, and some loose pills on the stove; some juice, condiments, and cat food were in the refrigerator; but there was no substantial food in the home. Pauline's bedroom was cluttered with articles of clothing and other items, making it difficult to navigate. Ms. Crippen determined that Pauline had been sleeping on the living room couch, which was also in disarray. Sergeant Dupont knocked on the door to the second

---

[4] The record contains various spellings of the witness's name. In this opinion, we adopt the spelling used in the documents attached to the Criminal Information.

[5] The name of this department was changed to the Office of Healthy Aging in 2019.

floor, which was locked, but there was no response. Pauline was then removed from the home and transported to Memorial Hospital for care; eventually she was admitted to that hospital and never returned to the Kenyon Avenue residence.

On August 3, 2016, defendant was charged by criminal information with seven counts of neglecting an adult with severe impairments in accordance with § 11-5-12.[6] Several pretrial motions were filed in this case, and the matter proceeded to trial on December 2, 2019. At the close of the state's case, after the testimony of eleven witnesses, defendant moved for a judgment of acquittal on all counts. The trial justice reserved decision. The defense rested on December 9, 2019, defendant renewed his motion for judgment of acquittal, and the trial justice once more reserved his decision. On December 12, 2019, the jury found defendant guilty of the six remaining counts. The defendant filed a motion for a new trial on December 19, 2019, which was heard and denied on January 31, 2020. The trial justice also denied defendant's prior motions for judgment of acquittal. The defendant appealed.[7]

---

[6] Count I was dismissed pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.

[7] The defendant filed two notices of appeal – one on January 2, 2020 from the judgment of conviction and one on February 6, 2020 from the denial of his motion for a new trial. Both notices of appeal are premature, as they appear to have been filed prior to the entry of the judgment of conviction. However, "[i]t is well settled that a premature notice of appeal will be considered timely so long as final judgment

- 8 -

## Standard of Review

"This Court reviews questions of statutory construction *de novo*." *State v. Jilling*, 275 A.3d 1160, 1164 (R.I. 2022) (quoting *State v. Peters*, 172 A.3d 156, 159 (R.I. 2017)). "Typically, '[i]n accordance with our well-settled practice of statutory construction, we first determine whether these statutory definitions, by their plain language, are clear and unambiguous.'" *Id.* (quoting *Peters*, 172 A.3d at 160). "Nevertheless, 'this [C]ourt has the responsibility of effectuating the intent of the Legislature by examining a statute in its entirety[.]'" *Id.* (quoting *State v. Smith*, 662 A.2d 1171, 1175 (R.I. 1995)). This Court is "mindful that ambiguities in penal statutes must be strictly construed in favor of the party upon whom a penalty is to be imposed." *Id.* at 1164-65 (quoting *State v. Hazard*, 68 A.3d 479, 485 (R.I. 2013)). Additionally, "[t]his Court will not construe a statute to reach an absurd result." *Id.* at 1165 (quoting *Long v. Dell, Inc.*, 984 A.2d 1074, 1081 (R.I. 2009)).

"When a trial justice considers a motion for a new trial, he or she acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Avila*, 252 A.3d 738, 742 (R.I. 2021) (quoting *State v. Phillips*, 244 A.3d 897, 903 (R.I. 2021)). "If, after conducting such a review, the trial justice reaches the same conclusion as the jury, the verdict should

is entered thereafter." *State v. Lamontagne*, 231 A.3d 1132, 1138 n.2 (R.I. 2020) (quoting *State v. Souto*, 210 A.3d 409, 415 n.8 (R.I. 2019)).

be affirmed and the motion for a new trial denied." *Id.* (quoting *Phillips*, 244 A.3d at 903).

**Analysis**

This Court has held that the party contesting the constitutionality of a statute has "the burden of proving beyond a reasonable doubt that the challenged enactment is unconstitutional." *State v. Allen*, 68 A.3d 512, 516 (R.I. 2013) (quoting *State ex. rel. Town of Westerly v. Bradley*, 877 A.2d 601, 605 (R.I. 2005)). "[W]e 'will attach every reasonable intendment in favor of * * * constitutionality in order to preserve the statute.'" *Id.* (quoting *State v. Russell*, 890 A.2d 453, 458 (R.I. 2006)). "A criminal statute will be declared void for vagueness * * * [when it] is so vague that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* at 516-17 (quoting *State v. Stierhoff*, 879 A.2d 425, 435 (R.I. 2005)). A challenge based on vagueness "rest[s] principally on [a] lack of notice" of the proscribed conduct. *Id.* at 517. Accordingly, "we see no reason to speculate whether the statute notifies a hypothetical defendant" if the present facts establish that the "defendant [was] given sufficient notice that his conduct [was] at risk[.]" *Id.* (quoting *State v. Sahady*, 694 A.2d 707, 708 (R.I. 1997)).

- 10 -

The defendant asserts that § 11-5-12[8] is vague and ambiguous because it fails to properly define the term "services necessary to maintain * * * physical or mental health" and, thus, does not notify a potential criminal defendant what conduct is proscribed. He argues that a putative caregiver would not be capable of understanding, without medical training, what services may be necessary to maintain the physical or mental health of a severely impaired individual. The defendant further contends that "services necessary to maintain * * * physical or mental health" is an essential required element of the statute. We reject these contentions.

"[A] penal statute 'must contain a description or definition of the act or conduct which comprises the offense contemplated therein stated with legal certainty.'" *State v. Carter*, 827 A.2d 636, 644 (R.I. 2003) (quoting *State v. Brown*, 97 R.I. 115, 119, 196 A.2d 133, 136 (1963)). "[S]o long as a statute is constitutionally specific in regard to a particular defendant, this Court will not consider a defendant's facial-vagueness challenge." *Sahady*, 694 A.2d at 708. When "determin[ing] whether [a statute] is unconstitutionally vague as to [a particular] defendant, we have stated previously that 'the standard employed is whether the disputed verbiage provides adequate warning to a person of ordinary intelligence

---

[8] Pursuant to § 11-5-12(a), "[a]ny person primarily responsible for the care of an adult with severe impairments who shall willfully and knowingly abuse, neglect, or exploit that adult" is in violation of the statute.

- 11 -

that his conduct is illegal by common understanding and practice.'" *Id.* at 709 (brackets and deletion omitted) (quoting *State v. Fonseca*, 670 A.2d 1237, 1239 (R.I. 1996)). In *Sahady*, the defendant argued "that the phrases 'when intoxicated' and 'under the influence' [as set forth in G.L. 1956 § 11-47-52] fail[ed] to adequately warn what conduct is proscribed by the General Assembly and that the statute is therefore facially vague and vague as applied to him." *Id.* at 708. This Court held that the standard for intoxication "embodie[d] common understanding and practice and [was] sufficiently precise to allow the general public to gauge its conduct," and was satisfied "that police authority [was] reasonably confined by the language of the statute." *Id.* at 709.

In the case at bar, § 11-5-12(a) declares that a primary caregiver "who shall willfully and knowingly abuse, neglect or exploit" an adult with severe impairments shall be subject to the penalties outlined in the act. The term "neglect" means the "fail[ure] to care for or attend to properly." The American Heritage Dictionary of the English Language 1179 (5th ed. 2011). "Neglect" is further specifically defined by the statute as "the willful refusal to provide services necessary to maintain the physical or mental health of an adult with severe impairments." Section 11-5-12(b)(4). Given the plain and ordinary meaning of the definition, we hold that the language of § 11-5-12 is clear and unambiguous and not susceptible to more than

one meaning. *See Freepoint Solar LLC v. Richmond Zoning Board of Review*, 274 A.3d 1, 6 (R.I. 2022).

Mr. Vose acknowledged that he was notified repeatedly that his mother was in need of services and that services were available given her diminished mental state, which he described as dementia. He admitted that Pauline was a "wanderer" and required GPS monitoring to ensure her safety. Nonetheless, defendant continued to allow his mother almost complete autonomy to roam the streets of Pawtucket, in harm's way. Pauline repeatedly was found wearing clothing that was inappropriate for the weather. She lived in squalor, in a dwelling that reeked of urine and animal feces and was unsanitary. The witnesses who escorted her home testified that they could find no substantial food in the residence for Pauline to consume, and that she was hungry. We are not confronted with a situation in which the type and degree of services provided to this elderly woman were insufficient "to maintain [her] physical or mental health[.]" Section 11-5-12(b)(4). There were no services provided to Pauline and no support to protect her from harm.

Further, we are of the opinion that the language of § 11-5-12, specifically the term "[n]eglect," "provides adequate warning to a person of ordinary intelligence that [this] conduct is illegal by common understanding and practice." *Sahady*, 694 A.2d at 709 (quoting *Fonseca*, 670 A.2d at 1239). We are satisfied that, based upon the evidence presented at trial, a jury could find that defendant violated §11-5-12 by

- 13 -

severely neglecting Pauline for an extended period of time. We reject defendant's contention that "services necessary to maintain * * * physical or mental health" is an essential element of the charged offense, as it is used only to further define the *actus reus* of the charge of neglect, and thus the state was not required to prove specific available services.

The defendant next contends that the term "severe impairment" as set forth in § 11-5-12 cannot be proven beyond a reasonable doubt without expert testimony, or without testimony from Pauline's medical providers. This Court has held that "the jury will benefit from expert testimony when the subject matter of the inquiry is one involving special skills and training beyond the ken of the average layman." *State v. Sheridan*, 252 A.3d 1236, 1246 (R.I. 2021) (quoting *State v. Roscoe*, 198 A.3d 1232, 1240 (R.I. 2019)). Expert witness testimony will not be required where "the facts and circumstances can be accurately described to a jury and * * * the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as is the expert * * *." *Id*. (quoting *Roscoe*, 198 A.3d at 1240-41).

The statute under review defines an "[a]dult with severe impairments" as one with a disability "attributable to a mental or physical impairment * * * result[ing] in substantial functional limitations in one or more of the following areas of major life activity: (i) mobility; (ii) self-care; (iii) communication; (iv) receptive and/or

expressive language; (v) learning; (vi) self-direction; (vii) capacity for independent living; or (viii) economic self-sufficiency." Section 11-5-12(b)(2).

This Court has noted that "[t]he majority of jurisdictions addressing [whether expert testimony is necessary to establish mental disability] have applied a case-by-case approach to assess whether lay evidence proffered at trial is sufficient to establish the victim's diminished mental state." *State v. Farley*, 962 A.2d 748, 755-56 (R.I. 2009) (quoting *State v. Gardiner*, 895 A.2d 703, 712 n.11 (R.I. 2006)).

Numerous witnesses in the case at bar testified that Pauline was found roaming the streets, often dressed inappropriately for the weather, in a dirty and disheveled condition. Pauline was frequently found in a state of confusion, unable to find her way home. She approached her neighbors multiple times maintaining that she was hungry and asking for food. She was transported to Memorial Hospital on several occasions due to her diminished mental state. The defendant himself declared that Pauline suffered from dementia and was a wanderer. He also stated that he used a GPS tracking device attached to his mother to create a zone for her to traverse the neighborhood due to her condition and that "[he] can't go anywhere" and has "to be home seven days a week."

Section 11-5-12, as enacted by the General Assembly, does not require expert testimony to establish severe impairment. Based on the evidence presented at trial, including defendant's own statements, we are satisfied that it was not beyond the

grasp of the "average layman" to determine that Pauline was an "adult with severe impairments," without the need for expert testimony. *See Sheridan*, 252 A.3d at 1246; § 11-5-12(b)(2).

The defendant next asserts that the trial justice misapplied § 11-5-12 when denying his motion for a new trial. When considering a motion for a new trial, a trial justice must undertake a three-step analysis: "(1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury." *State v. Moore*, 154 A.3d 472, 480-81 (R.I. 2017) (quoting *State v. Fleck*, 81 A.3d 1129, 1134 (R.I. 2014)).

In arguing that the trial justice erred in his decision to deny the motion for a new trial, defendant reiterates his contention that the state was required to establish the services that were necessary to maintain Pauline's physical or mental health. The defendant asserts that the trial justice improperly found that safety issues satisfied the statutory element of services necessary to maintain the physical or mental health of the person and that the trial justice failed to make reference to any evidence that there were services necessary to maintain Pauline's physical or mental health that were available and were willingly and knowingly refused by defendant.

The trial justice thoroughly performed the required three-step analysis; he reviewed the evidence in light of the jury charge, independently assessing the

credibility of the witnesses and the weight of the evidence to determine whether he would have reached a result different from that of the jury. The trial justice first addressed whether defendant was the person primarily responsible for Pauline's care. He noted that defendant told the police that he took care of all of Pauline's needs, including all meals, clothing, and medications. He also highlighted the fact that defendant not only moved to Rhode Island to care for his mother, he had power of attorney over all of her affairs. Based on the evidence presented, the trial justice concluded that defendant was the person primarily responsible for Pauline's care.

The trial justice next addressed whether Pauline was an adult with severe impairment. The trial justice referenced Pauline's hospital records that indicated she had a disability attributable to a mental impairment, which resulted in substantial functional limitations in the areas of self-care, communication, self-direction, and capacity for independent living. He then recounted the testimony of multiple witnesses regarding their observations of Pauline's physical and mental state during their interactions with her, including the lack of appropriate clothing for the weather and her confusion as to where she lived. After considering this evidence, the trial justice concluded that a jury could find, beyond a reasonable doubt, that Pauline was an adult with severe impairments. He further found that this determination could be made by a jury without the need for expert testimony.

The last issue addressed by the trial justice in considering defendant's motion for a new trial was whether Vose knowingly and willfully refused to provide services necessary to maintain Pauline's physical or mental health. The trial justice once again referred to defendant's November 2015 interview with the Pawtucket police, in which Vose indicated that Pauline had Alzheimer's or dementia but that he did not consider her wandering to be dangerous. The trial justice emphasized that, during this interview, defendant suggested that he did not consider getting his mother adult day care services at the Leon Mathews Center because they would not accept wanderers, and that his mother did not want the services anyway.

The trial justice further acknowledged that defendant indicated that he had been investigating nursing home services, but that Pauline did not want to go to a nursing home, nor did she want to receive any services outside the home or have home-care nursing. The trial justice noted defendant's statement that he found it annoying to get messages from people offering services that his mother would not accept, so he stopped answering.

The trial justice lastly cited the testimony of Sgt. Dupont when ruling on the motion for a new trial. Sergeant Dupont testified that he reviewed ten to fifteen incident reports during 2015 involving Pauline. After each report, he contacted the Division of Elderly Affairs and the Leon Mathews Center to ascertain if Pauline was receiving services. Upon learning that defendant was Pauline's caretaker, Sgt.

Dupont attempted to contact him to learn why services were not being provided to her, but was unsuccessful in contacting him.  Based on this evidence, the trial justice found that a jury could find, beyond a reasonable doubt, that defendant knowingly and willfully refused to provide services necessary to maintain his mother's physical or mental health during the dates that defendant was charged.[9]

The trial justice found that the testimony of the state's witnesses should be given great weight.  He pronounced that the jury verdict was well-warranted, and that he agreed with the verdict.  The trial justice then denied defendant's motion for a new trial in accordance with Rule 33 of the Rhode Island Superior Court Rules of Criminal Procedure.

"In ruling on a motion for new trial, 'the trial justice need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards.'" *State v. Mondesir*, 891 A.2d 856, 862 (R.I. 2006) (quoting *State v. Otero*, 788 A.2d 469, 472 (R.I. 2002)).  Based upon the trial justice's comprehensive review of the

---

[9] In view of the trial justice's proper analysis of the motion for a new trial, we need not address defendant's contention that "safety concerns" or "lack of supervision" do not satisfy the element of "services necessary to maintain the physical or mental health of an adult with severe impairments."  This Court, however, has recognized "supervision" as a social service. *See In re William, Susan, and Joseph*, 448 A.2d 1250, 1253 (R.I. 1982) (describing certain witness testimony stating that if a woman was given custody of her children, "she would require almost constant supervision," which was "a social service unavailable from * * * existing state agencies").

evidence and testimony presented at trial, we decline to disturb the ruling on defendant's motion for a new trial.

Finally, defendant argues that the state violated Rule 16 by failing to provide a witness list before the first day of trial, and then failing to call more than half of the witnesses on the list it did provide. It has been well established by this Court that "an issue not preserved by specific objection at trial, may not be subsequently considered on appeal." *State v. Alston*, 47 A.3d 234, 243 (R.I. 2012) (quoting *State v. Goulet*, 21 A.3d 302, 308 (R.I. 2011)). Moreover, an issue that was not raised during trial "cannot belatedly be asserted during the motion for a new trial." *State v. Albanese*, 970 A.2d 1215, 1222 (R.I. 2009).

Although the defendant raised vague concerns about the state's witness list during trial, the issue of a Rule 16 discovery violation was not addressed until the defendant's motion for a new trial. During the trial, defense counsel remarked that the witness list provided contained individuals who had not been disclosed prior to trial but failed to make any objections to the list. Because this issue was not raised until the defendant's motion for a new trial, it was not properly preserved, and we decline to address it here. We note however, that, were the Court to address the defendant's contention, we would hold that it has no merit.

**Conclusion**

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The papers in this case may be returned to the Superior Court.

**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903



# OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Carlton Vose. |
| **Case Number** | No. 2020-274-C.A. (P2/16-2326A) |
| **Date Opinion Filed** | February 1, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robison, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Joseph A. Montalbano |
| **Attorney(s) on Appeal** | For State: Mariana E. Ormonde Department of Attorney General |
| | For Defendant: Carlton Vose, *Pro Se* |